Thomas WALKER, Plaintiff-Appellant,

v.

TIME LIFE FILMS, INC., David Susskind, Gill Champion, Martin Richards and Heywood Gould, Defendants-Appellees.

No. 518, Docket 85–7690.

United States Court of Appeals, Second Circuit.

Argued Nov. 20, 1985.

Decided Jan. 7, 1986.

Jimmie L. Engram, New York City, for plaintiff-appellant.

Eugene L. Girden, New York City (Patterson, Belknap, Webb & Tyler, Blair Axel, of Counsel), for defendants-appellees.

Before FEINBERG, Chief Judge, LUMBARD and OAKES, Circuit Judges.

FEINBERG, Chief Judge:

Plaintiff Thomas Walker, author of the book "Fort Apache," appeals from an order of the United States District Court for the Southern District of New York, David N. Edelstein, J., granting summary judgment for defendants in plaintiff's copyright action against Time Life Films, Inc., David Susskind, Gill Champion and Martin Richards, producers of the film "Fort Apache: The Bronx," and Heywood Gould, the film's screenwriter. The district court held as a matter of law that the book and the film were not substantially similar in their copyrightable aspects, 615 F.Supp. 430. Appellant argues that substantial similarity remained a genuine factual issue, and contends that the district court made several evidentiary errors in comparing the two works. We conclude that no reasonable observer could find substantial similarity between the protectible elements of plaintiff's book and defendants' movie, and that the district court did not abuse its discretion in its other rulings. Accordingly, we affirm.

I.

This litigation arises out of two works depicting the violence and urban decay of the 41st Precinct of the New York City Police Department. The 41st Precinct, located in the South Bronx, has been known among police officers by the nickname "Fort Apache" since the late 1960's for its high incidence of violent crime, which has drawn the attention of the press and other news media. Appellant Walker, a former New York City police officer, was assigned there as a lieutenant from May 1971 until August 1972. Based upon his experiences, he wrote a book entitled "Fort Apache," published in 1976 in hardcover and in paperback, which sold in excess of 100,000 copies.

As its author describes it, "Fort Apache" is a chronicle of true events. Narrated by Walker, it begins on his first day at the precinct station house, where he is shocked by its squalor, an attack on the station house by an angry mob, and the apparent inability of the police to maintain its security. On his first day, he also witnesses several violent crimes, and notes that much of the area's housing is ruined or dilapidated. Successive chapters give Walker's harrowing impressions of dozens of ugly and sometimes bizarre murders, suicides, robberies and other crimes, as well as of the drug-dealing, prostitution and physical devastation that characterize the neighborhood. Through his accounts, he illustrates some of the social patterns of the South Bronx, including family life and the popularity of youth gangs. Through anecdotes, the book also illustrates the morale of the precinct's officers and the ways they respond to the stresses of their work.

The book unfolds as a chronicle of police work and daily life in a violent neighborhood. Several chapters focus on specific topics, such as attacks on policemen. Throughout the book, Walker expresses compassion for those he considers the victims of the South Bronx, hopelessness regarding the prospects for basic improvement there, and a sense that the officers of the 41st Precinct will continue to fight a rearguard action against lawlessness with very limited success. The book ends with his transfer to another precinct.

Defendants produced and wrote the screenplay for the film entitled "Fort Apache: The Bronx," which is set in the same milieu as plaintiff's book. In 1973,

Heywood Gould made a contract with the newly formed Fort Apache Company to write a screenplay for a film set in the South Bronx. The following year, the Company filed a draft screenplay written by Gould with the United States Copyright Office. In 1976, defendants placed an advertisement in the trade journal "Variety" announcing the production of a film. "Fort Apache: The Bronx" was released in 1981.

The movie focuses on Connolly, the newly arrived captain of the 41st Precinct, and Murphy, a rank-and-file veteran of 12 years there, and their responses to the crime and decay of the South Bronx. The film also portrays the close relationship of Murphy and his partner, Corelli. The film opens with the motiveless murder of two rookie policemen by a deranged prostitute. Much of the film shows the extensive, finally unsuccessful efforts of the police to locate the killer. The prostitute, in the meantime, is rescued by Murphy from a beating by her pimp, and thereafter murders another man. While engaged in the search, Murphy and Corelli respond to a bewildering variety of other South Bronx characters, crises and crimes, including a fleet-footed mugger, the birth of a child to a teenage mother and mob attacks on firefighters and policemen. The film centers around Murphy's affair with a drug-addicted nurse, who eventually is killed by drug dealers trafficking in narcotics at the hospital where she works. In addition, Murphy and Corelli witness the murder of a Hispanic teenager by fellow officers who throw the boy off a roof. After agonizing over whether to denounce the officers, Murphy does so against the advice of the nurse and Corelli, but tenders his resignation to Connolly at the same time. Connolly, however, asks Murphy to reconsider. Meanwhile, the drug dealers, who have given the nurse a fatal overdose, barricade themselves with hostages in the hospital. At the movie's climax, Murphy rescues the hostages. He then succeeds in catching the mugger, displaying a pride in his work that implies he will return to his job.

Walker contends that defendants infringed his copyright by copying from the manuscript for his book. He claims that Heywood Gould, then a reporter, met Walker on a visit in late 1971 or early 1972 to the 41st Precinct, and learned that Walker was working on a book. Walker then, he says, showed Gould the manuscript on the condition that Gould not take notes on it. Gould, however, examined the manuscript for several hours and took notes. Shortly thereafter, the manuscript disappeared from the station house. Gould denies ever having met Walker or read any version of his book, and contends that he received the idea for the screenplay from news reports describing a crime in the area and from two other officers.

In 1980, while defendants' film was still in production, Walker sued defendants in New York state court for infringement, common law copyright, fraud, conversion, unfair competition and conspiracy to commit fraud. The New York Supreme Court dismissed the infringement claim on the ground that the federal courts had exclusive jurisdiction over copyright actions. Holding that Walker's other legal theories merely duplicated his infringement claim, the court dismissed the entire action for lack of jurisdiction. *Walker v. Time Life Films, Inc.*, No. 8938/80 (N.Y.Sup.Ct.1983).

Subsequently, Walker brought this action in federal court under 28 U.S.C. § 1338(a), alleging copyright infringement, Lanham Act violations, unfair competition and breach of a confidential and fiduciary relationship. No demand was made for a jury trial. After the parties agreed to a pre-trial order incorporating stipulated facts, defendants moved for summary judgment. Defendants conceded for the purpose of their motion that Gould had had access to Walker's manuscript, but argued that the book and the film were so different that no reasonable trier of fact could find them substantially similar under the copyright laws. In support of this argument, defendants offered affidavits, some of which were prepared by an expert in literary analysis, analyzing and comparing the structure, mood, characters, themes and episodes of the two works. In re-

sponse, Walker also submitted affidavits by an expert, highlighting and listing similarities between the works. In addition, Walker offered documentary evidence purportedly showing that lay observers believed the film to be derived from the book, as well as a videotape of the film, with voiceovers drawing attention to similar events or passages in the book and the first portion of the film (the voiceover version).

After reading the book and viewing the movie, and considering the experts' affidavits, Judge Edelstein granted defendants' motion. The judge rejected the claim of infringement because no reasonable observer could find the works substantially similar, and whatever similarities existed were trivial, abstract or related to noncopyrightable material. The judge refused, however, to view the voiceover version or to compare the works on the basis of Walker's proffered lists of similarities. Concluding that the movie and the book were not confusingly similar and that defendants had not attempted to "pass off" the film as derived from the book, the court granted summary judgment on the Lanham Act claim, and found the pendent state law claims barred for failure to state a cause of action and preempted by the copyright laws. Accordingly, the judge dismissed the entire complaint on the merits in a well-reasoned opinion, reported at 615 F.Supp. 430. This appeal followed.

## II.

■ It is undisputed that appellant Walker has a valid copyright in his book. To prove infringement, he must also show copying by defendants. *Warner Brothers v. American Broadcasting Co.*, 654 F.2d 204, 207 (2d Cir.1981) (Warner I). Copying may be inferred where a plaintiff establishes that the defendant had access to the copyrighted work and that substantial similarities exist as to protectible material in the two works. *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). Put another way, Walker must show that his book was "cop-

ied," by proving access and substantial similarity between the works, and also show that his expression was "improperly appropriated," by proving that the similarities relate to copyrightable material. *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946); *Davis v. United Artists, Inc.*, 547 F.Supp. 722, 723 (S.D.N.Y.1982).

### A. General Claims of Similarity.

■ In moving for summary judgment, defendants conceded access to Walker's manuscript, thus narrowing the issues to the similarity between the works. In response, Walker argued that "Fort Apache" and "Fort Apache: The Bronx" were similar in plot, theme, dialogue, mood, setting, pace and sequence. He now asserts that these parallels, akin to what the late Professor Nimmer termed "comprehensive nonliteral similarity," 3 Nimmer on Copyright § 13.03[A][1] (1985) (hereinafter Nimmer), raised questions of fact that could not be resolved on a motion for summary judgment. However, a district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff work, or when no reasonable trier of fact could find the works substantially similar. *Warner Brothers v. American Broadcasting Co.*, 720 F.2d 231, 240 (1983) (Warner II). To determine whether the grant of summary judgment was proper, we must decide whether the lack of substantial similarity between the protectible aspects of the works was "so clear as to fall outside the range of disputed fact questions" requiring resolution at trial. *Id.* at 239.

■ The copyright protection granted to appellant's book extends only to its particular expression of ideas, not to the ideas themselves, 17 U.S.C. § 102(b), a distinction easier to state than to apply. In assessing claims of substantial similarity, courts therefore must decide "whether the similarities shared by the works are something

more than mere generalized idea or themes," *Warner I, supra*, 654 F.2d at 208, a task generally performed after detailed examination of the works themselves, see, e.g., *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49 (2d Cir.), cert. denied, 298 U.S. 669, 56 S.Ct. 835, 80 L.Ed. 1392 (1936). Judge Learned Hand articulated this distinction in his often-quoted "abstractions" test:

> Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times consist only of its title; but there is a point in this series of abstractions where they are no longer protected. . . .

*Nichols v. Universal Picture Corp.*, 45 F.2d 119, 121 (2d Cir.), cert. denied, 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

▆ Each of the panel members has read the book and viewed the film. Applying these principles to appellant's claim that the film replicates the fundamental structure, setting and pace of his book, we conclude from a comparison of the two works that no reasonable observer could find them substantially similar beyond the level of generalized or otherwise nonprotectible ideas. We note at the outset that Walker's book, by Walker's own description, is an account of actual events. This renders proof of infringement more difficult, because copyright protection in this circuit does not extend to facts or to true events, even if they are discovered through original research. Appellees therefore were free to avail themselves of any facts contained in Walker's book, see *Hoehling, supra*, 618 F.2d at 979–80, so long as they did not appropriate his unique expression of those facts.

At the most general level, the movie and the book tell the same story. Both recount the experiences of policemen battling the hostile environment of the 41st Precinct. But, in moving to the next level of specificity, differences in plot and structure far outweigh this general likeness. "Fort Apache: The Bronx" is intensely plotted. Much of the work is dedicated to several vivid, interrelated story lines. Throughout the film the police engage in an extensive manhunt for the killer of their fellow officers, making mass arrests and sweeping the South Bronx for leads. Murphy begins a love affair that first blossoms, but ends tragically. He experiences moral doubts, which he eventually resolves, in deciding whether to testify against fellow officers who have committed a crime. Connolly struggles, with sometimes unfortunate consequences, to transform the precinct and the station house into an orderly "house of law" enjoying the respect of the area's residents. The book, on the other hand, is organized topically, moves anecdotally from one event to another, and has little plot or story line. As a nonstop recounting of brutal crimes and police action, it achieves its effects by creating a depressing, somewhat impressionistic, cumulative portrait of life in a crime-ridden and poverty-stricken urban neighborhood.

Thus, the works differ radically in pace and dramatic structure. The story lines of "Fort Apache: The Bronx" impart a continuity and suspense entirely missing from the book. In the film, each subplot and set of characters also relates to all the others. For example, the drug dealers who traffic in narcotics at the hospital first appear as targets of an undercover investigation. Later, they encounter the deranged prostitute who, unknown to them, has killed the two police officers in the movie's opening scenes. She attempts unsuccessfully to kill one of the two dealers as well, and he stabs her fatally. The dealers next discover that the drug-addicted nurse is Murphy's lover, and, fearing that she will expose their operation, decide to kill her by selling her pure heroin. After carrying out their plan, they are caught selling narcotics in the hospital and barricade themselves in a room there, taking doctors and nurses as hostages. Murphy, believing that the nurse is in the room, leads a bloody rescue of the hostages. On finding that the nurse is not among them, he rushes to find her, only to

be confronted by the sight of her dead body in the emergency room. The book contains no such plot intricacies. Rather, diary-like, it presents a series of randomly-ordered sketches of police life and work, without significant character or plot development. Although individual vignettes sometimes carry suspense, no continuing story emerges to engage the reader's attention.

To be sure, the book and the film share an identical setting, and police officers are central characters in both works. But the South Bronx and the 41st Precinct are real places known to the public through media reportage. Accordingly, the notion of telling a police story that takes place there cannot be copyrightable. As to Walker's claim that the film misappropriates characters from his book, we must consider the "totality of [their] attributes and traits" as well as the extent to which the defendants' characters capture the "total concept and feel" of figures in the book. *Warner II, supra*, 720 F.2d at 241. The characters of "Fort Apache: The Bronx," however, are quite different from those in the book. In the film, Murphy is an independent-minded, cynical, divorced patrolman contemptuous of authority, once demoted for insubordination. Murphy's romantic scenes reveal tenderness; his soul-searching over whether to denounce fellow officers reveal both integrity and loyalty. By contrast, his boss, Captain Connolly, is a hard-driving disciplinarian eager to "go by the book" and establish the rule of law in the South Bronx. Walker, the book's narrator, is a pragmatic, happily-married lieutenant who never disobeys an order or questions his superiors. In his life history, outlook, rank and marital status he bears little resemblance to any of the film's characters.

## B. *Specific Claims of Similarity.*

In the district court, appellant proffered lists of specific alleged similarities in an attempt to prove, in Professor Nimmer's term, "fragmented literal similarity" between the book and the film. 3 Nimmer, supra, § 13.03[A][2]. None of these claims

alters our conclusion that the district court properly held that as a matter of law no substantial similarity exists between the protectible elements of the works. For example, appellant notes that both the book and the film begin with the murder of a black and a white policeman with a handgun at close range; both depict cockfights, drunks, stripped cars, prostitutes and rats; both feature as central characters third- or fourth-generation Irish policemen who live in Queens and frequently drink; both show disgruntled, demoralized police officers and unsuccessful foot chases of fleeing criminals.

These similarities, however, relate to uncopyrightable material. The killing of the two police officers actually occurred and was reported in the news media, which placed the historical fact of the murders in the public domain and beyond the scope of copyright protection. *Hoehling, supra*, 618 F.2d at 978–79. Elements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the work of policemen in the South Bronx. These similarities therefore are unprotectible as "scenes a faire," that is, scenes that necessarily result from the choice of a setting or situation. See *Reyher, supra*, 533 F.2d at 92. Neither does copyright protection extend to copyright or "stock" themes commonly linked to a particular genre. Foot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction. As such, they are not copyrightable except to the extent they are given unique—and therefore protectible—expression in an original creation.

Appellant lists other events claimed to occur in both works. Leaving aside the difficulty of comparing unified artistic works on the basis of such scattered analogies, we find that when the works are examined the claimed similarities either fail to materialize or prove entirely insubstantial. Appellant correctly notes, for instance, that in both works a person is thrown off a roof. But the differences between the two incidents are overwhelm-

ing. In the book, two children hurl a third from a rooftop. He falls wounded into a narrow space between two buildings, where Walker finds and rescues him. In the movie, two police officers throw a teenager from a building to his death in a street crowded with people, and the incident leads to Murphy's struggle with himself over whether to identify the culprits. We conclude that none of appellant's claims of related events in the book and the movie raised a material issue as to their similarity.

None of appellant's other documentary evidence was sufficient to bar summary judgment. He argues that evidence he offered tended to show that lay observers considered the movie to be derived from the book and therefore raised a genuine issue as to their similarity. In particular, he claims that three newspaper articles demonstrated that reporters believed that the book and the film were related. Even assuming that the articles were relevant on the question of similarity, they had no probative value. One was the creation of a movie reviewer who later admitted that he had never read Walker's book. Both the others were accounts of a visit to Florida of the doctor who delivered Walker at birth, and mentioned Walker only in passing as the author of both the book and the film. Appellant contends that similarities between a review of his book and the analysis of his book prepared by the defendants' expert witness raise questions concerning similarities in the works themselves. But comparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws, cf. *Davis, supra,* 547 F.Supp. at 724–25, because the works themselves, not descriptions or impressions of them, are the real test for claims of infringement.

██ Appellant makes several claims of evidentiary error. He contends that the district court erred in considering the affidavit of a literary expert submitted by defendants, which analyzed the plot, themes, structure, characters and pace of both works. District courts, appellant claims,

routinely exclude such expert testimony when entertaining motions for summary judgment on the question of similarity.

The relevance, and hence the admissibility, of expert analysis on this issue depends on the standard for determining substantial similarity. We note that some confusion surrounds the standard to be applied. The formula most favored by courts, see *Nimmer, supra,* § 13.03[E][1], and often expressed in our circuit, see, e.g., *Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.,* 509 F.2d 64 (2d Cir.1974); *Ideal Toy Corp. v. Fab-Lu Ltd.,* 360 F.2d 1021 (2d Cir.1966), is that substantial similarity should be judged by the spontaneous response of the ordinary lay observer. Taken literally, such a standard would altogether bar expert analysis and "dissection" of creative works. See *Nichols, supra,* 45 F.2d at 123 ("We hope that in this class of cases [expert] evidence may in the future be entirely excluded."). However, our opinion in Arnstein v. Porter, supra, indicated that such literalness is not required. That decision framed a two-part test for similarity by drawing a distinction between noninfringing "copying," on the one hand, which may be inferred from substantial similarities between the two works, and infringing "illicit copying," on the other, which demands that such similarities relate to protectible material. Under *Arnstein,*

the trier of the facts must determine whether the similarities are sufficient to prove *copying.* On this issue, analysis (dissection) is relevant, and the testimony of experts may be received.... If copying is established, then only does there arise the second issue, that of *illicit copying* (unlawful appropriation). On that issue ... the test is the response of the ordinary lay hearer; accordingly, on that issue, 'dissection' and expert testimony are irrelevant.

154 F.2d at 468 (emphasis added). See also *Sid & Marty Krofft Television Productions v. McDonald's Corp.,* 562 F.2d 1157, 1164–65 (9th Cir.1977); (expert testimony admissible to similarity of ideas or themes, but not as to similarities of expression, as

to which the relevant test is "the observations and impressions of the average reasonable reader"); *Davis v. United Artists, supra,* 547 F.Supp. at 724 & n. 8. Cf. *Warner II, supra,* 720 F.2d at 245 (refusing to decide whether surveys of public opinion are admissible on the question of similarity, but noting that substantial similarity is "not a concept familiar to the public at large" but rather "a term to be used in a courtroom" to strike a balance between the rights of authors and the freedom of other creators). We do not believe that Judge Edelstein's consideration of the affidavits was improper under *Arnstein.* Assuming arguendo that some of the "dissection" was improper, which we do not believe to have been the case, any error made in this regard was harmless since we find that no trier of fact could find the works substantially similar in their protectible aspects.

■ In addition, appellant asserts that the district court erred in refusing to consider the voiceover version of the film, and in refusing to compare the book and the film on the basis of appellant's list of purported similarities. We disagree. Fed.R. Evid. 1006, despite appellant's contentions, did not require that the voiceover version be admitted. The Rule is designed to deal with the problem of writings, recordings or photographs "which cannot conveniently be examined in court" by allowing them to be presented in "chart [or] summary form," and does not apply to the movie, which could be viewed in its undistorted entirety by the use of standard projection equipment. Moreover, as the district court noted, in copyright infringement cases the works themselves supersede and control contrary descriptions of them. As the finally released version of the film was the best and most relevant evidence on substantial similarity, the judge was not required to consider the voiceover version in deciding the motion for summary judgment. In any event, the voiceover version adds nothing of significance to the briefs.

■ Appellant's argument that Judge Edelstein should have compared the book and the film on the basis of a list of similarities is similarly without merit. Courts customarily decide infringement cases, once access is decided, primarily through detailed viewing or reading of the works themselves. See, e.g., *Warner II, supra; Hoehling, supra; Nichols, supra.* While it might be an abuse of discretion to bar a plaintiff from using such lists in arguing on a summary judgment motion that similarities exist, appellant's objection has no force because Judge Edelstein had the alleged similarities called to his attention and focused on them carefully in his excellent opinion.

■ Finally, we need not decide whether Judge Edelstein erred in excluding from his consideration early drafts of the screenplay of the film. Generally, such early drafts might be useful to show that defendants had gained access to plaintiff's work, borrowed from it, and later made changes in order to conceal that borrowing. Although defendants conceded access in this case, early drafts could still have been evidence that some borrowing occurred. However, since we conclude as a matter of law that, even assuming borrowing or copying, no substantial similarity exists between the protectible portions of the final versions of the works, any error in exclusion of the early drafts was harmless.

### III.

■ In pressing his claim under the Lanham Act, Walker argued that appellees had attempted to confuse the public into believing that the film was derived from his book, in order to trade on the book's popularity. The district court's conclusion that the works were not substantially similar seriously undermines the theory that the film itself was designed to mislead viewers into associating it with Walker's book. See *Warner II, supra,* 720 F.2d at 246–47. Appellant also contends that the advertisement appellees placed in "Variety" in 1976 was itself an attempt to wrongfully "pass off" the film as a work created by Walker or derived from his work. The district court found, however, that no rea-

sonable observer could infer from the advertisement that the film derived from "Fort Apache," or that the two works came from a common source. From our examination of the film and the "Variety" advertisement, which do not even mention Walker or his book, we agree. To bolster his argument that the public could not tell the book and the film apart, appellant offered the three newspaper articles described above. As already indicated, the articles were so unreliable and isolated as to deserve very little weight. The Lanham Act claim was therefore properly dismissed.

■ In addition, the district court was correct to dismiss appellant's pendent state law allegations of unfair competition and breach of a confidential relationship. As the New York Supreme Court found in appellant's state court action, Walker's cause of action for unfair competition is preempted by the federal copyright laws to the extent it seeks protection against copying of Walker's book. 17 U.S.C. § 301(a); see *Oboler v. Goldin*, 714 F.2d 211 (2d Cir.1983). We also agree that summary judgment was appropriate on Walker's claim that Heywood Gould breached a confidential or fiduciary relationship with Walker, because Walker failed to produce facts sufficient to show that Walker and Gould ever made any such agreement or that such a relationship otherwise existed between them.

■ Last of all, we conclude that the district court acted properly in dismissing Walker's state law claims on the merits after disposing of the federal claims. While federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment, see *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974), we think that the circumstances here were exceptional. Many issues critical to appellant's state law claims, including their relationship to federal law, overlap considerably with the issues central to his claim of infringement. Moreover, the New York

state courts have already considered appellant's state law causes of action, and found them to be "equivalent to" the federal claims. Considerations of "judicial economy, convenience and fairness to litigants," *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), therefore made it proper for the district court to retain jurisdiction over the state law claims and to decide them on the merits.

The order granting summary judgment is affirmed.