**Geoffrey T. WILLIAMS,**
**Plaintiff–Appellant,**

v.

**Michael CRICHTON; Alfred A. Knopf, Inc.; Random House, Inc.; Universal City Studios, Inc.; MCA, Inc.; Amblin Entertainment, Inc.; Steven Spielberg; David Koepp, Defendants–Appellees.**

**No. 1233, Docket 94-7951.**

United States Court of Appeals,
Second Circuit.

Argued April 2, 1996.

Decided May 22, 1996.

Jerome R. Halperin, New York City (Guy S. Halperin, Kyle Mallary Halperin, Halperin Klein & Halperin, of counsel), for Plaintiff–Appellant.

Richard Dannay, New York City (David O. Carson, Schwab Goldberg Price & Dannay, of counsel), for Defendants–Appellees.

Before OAKES, WINTER and CALABRESI, Circuit Judges.

OAKES, Senior Circuit Judge:

Geoffrey T. Williams ("Williams") appeals a summary judgment of the United States District Court for the Southern District of New York, Lawrence M. McKenna, *Judge,* entered August 25, 1994, in favor of Appellees Michael Crichton, Alfred A. Knopf, Inc., Random House, Inc., Universal City Studios, Inc., MCA, Inc., Amblin Entertainment, Inc., Steven Spielberg, and David Koepp, on Williams's claim of copyright infringement. 860 F.Supp. 158 (S.D.N.Y.1994). Williams asserts that the district court erred in concluding that Williams's works and the Appellees' works were not substantially similar. For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

This is an action for copyright infringement under the Copyright Act of 1976, *as amended,* 17 U.S.C. §§ 101 *et seq.* (1994), and for an accounting of profits. Williams claims that the Appellees' novel and movie *Jurassic Park* (together, the *"Jurassic Park* works") infringe upon children's stories that he authored and copyrighted. In reviewing the facts underlying this summary judgment motion, we construe the evidence in the light most favorable to Williams, the non-moving party. *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

Between 1985 and 1988, Williams created and published four original copyrighted works of fiction for children: (1) *Dinosaur World,* published in 1985 ("Book I"); (2) *Lost in Dinosaur World,* published in 1987 ("Book II"); (3) *Explorers in Dinosaur World,* published in 1988 ("Book III"); and (4) *Saber Tooth: A Dinosaur World Adventure,* published in 1988 ("Book IV") (together, *"Dinosaur World* books"). Williams or his agent applied for and was issued a Certificate of Registration by the Register of Copyrights for Book I in December 1988 (registration number TX–1–966–153); Book II in August 1993 (TX–3–598–943); Book III in March 1988 (TX–2–294–611); and Book IV in November 1988 (TX–2–541–662).

Each of the four books is an adventure story for children that takes place in "Dinosaur World," described in Williams's brief as "an imaginary present day man-made animal park for dinosaurs and other pre-historic animals where ordinary people... can, in presumed safety, visit, tour and observe the creatures in a natural but hi-tech controlled habitat." Books I and IV are simple stories of children visiting and touring Dinosaur World. Williams concedes that these two books, read alone or together, are not infringed upon by the *Jurassic Park* works, though there are a few similarities.[1] We will focus, then, on the similarities between Books II and III and the *Jurassic Park* works. As a determination of substantial similarity requires a "detailed examination of the works themselves," *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986), we will summarize each work at issue.

### Lost in Dinosaur World

*Lost in Dinosaur World* is thirty pages long. The story opens with the McDunn family preparing for a trip to Dinosaur World. Young Tim is "dressed for *adventure*," though his mother reminds him, "[w]e're just going to Dinosaur World, Tim. Not to the jungle or someplace dangerous." Tim, his sister Mary, and Mr. and Mrs. McDunn pile into the car and set off for Dinosaur World.

From this opening scene, a mood of adventure and perhaps even danger is created. Tim brings a survival kit along with him, and Mr. McDunn comments upon Tim's desire to see the "scariest animal in the park," the allosaur. The setting of Dinosaur World enhances the mood. It is described as a place with

> tall pines rising overhead, along with exotic ferns, ginkgo and monkey puzzle trees; giant pterosaurs and pteranodons circling in the blue sky, their eerie, high-pitched squeals carrying across the distance; roars, grunts and growls coming from deep

in the forest, made by who-knows-what-kind of wild creatures; rumblings and puffs of grey smoke and steam curling from the top of a small volcano.

After the family arrives at Dinosaur World, they buy tickets and receive a map and a radio guide that can answer questions about the animals in the park. They discuss whether to visit the Nursery or proceed directly to the T–Rex Express, a train shaped like a tyrannosaurus rex that tours Dinosaur World. Tim is eager to board the T–Rex Express, but the other McDunns want to go to the Nursery. As Tim's father says, "Tim, it won't take but a few minutes, and I'm sure there'll be plenty of exciting things for you to do today." The narration continues: "Little did Mr. McDunn know how true that was."

While discussing the day's plans, the family is surprised to see a brachiosaur, "the biggest land animal that ever lived," eating leaves from the tops of the trees. The family then enters the Nursery, a "warm and humid" glass-roofed building, and views protoceratops hatchlings and eggs.

Next, the McDunns proceed to the T–Rex Express. Tim purchases a "Supertour" ticket, allowing him to ride the train through each of the geologic periods in which dinosaurs lived: the Triassic, Jurassic, and Cretaceous eras. The rest of the family purchases tickets only for the Triassic era. "After that Tim would be on his own. He was very excited."

During the trip through the Triassic period, the train passes by the shore of the Dinosaur Sea where it is approached by a shrieking, twenty-five foot nothosaur. Several train passengers scream as the nothosaur comes "closer and closer, until Tim could hear him breathe and see water dripping from his needle-sharp teeth." When the nothosaur suddenly slips back into the sea, Tim is left "a little frightened and wondering how much excitement the rest of the trip would bring."

At the end of the Triassic tour, Tim's family disembarks, his father warning:

---

1. These similarities are: in Book I, an initial encounter between visitors and dinosaurs "smaller than a chicken" and a stampede of dinosaurs running from a tyrannosaurus rex; and in Book IV, the use of an automated cable car ride through Dinosaur World.

This is your first trip here, so be very careful not to lose your guide. Whatever you need to know, just ask. And remember, no matter what happens, don't get off the train.

Watching his family disappear from sight, Tim "couldn't help feeling just a little lonesome as he continued his adventure."

The tour continues into the Jurassic period. As Tim leans out the train window to get a better view of several diplodocus wading in a swamp, he "did something that would change his whole day": he knocked the radio guide out of the window. "It clattered down the embankment by the side of the tracks and came to rest almost under the tail of a huge stegosaur...." Tim climbs out of the train to retrieve the guide, taking the opportunity to touch the "thick and wrinkled" skin of the stegosaur, that rattled its tail "ominously" at the intrusion, but then continued eating a plant.

As Tim picks up the guide, he hears the T–Rex Express leave the area without him. "Without any warning, ... he was alone— lost in the middle of Dinosaur World." As Tim stands alone on the train tracks, with several dinosaurs staring at him and distant roars sounding in the distance, the radio guide sputters back to life, and warns "how fast can you run? ... you don't want to get caught out here when *the allosaur zzz bzzt ssstrt grrx.*" Hearing the warning, Tim begins to think about the allosaur, an animal "that stood over twenty feet tall, had teeth like steak knives and a disposition like a bucket of rattlesnakes." "[N]ow Dinosaur World seemed mysterious. Strange. Perhaps even ... dangerous."

Walking on his own, Tim encounters a lost baby parasaurolophus, a duckbill dinosaur. Tim feeds it, and the dinosaur follows him through the park. An allosaur then emerges from the trees and chases Tim and the baby dinosaur. Tim "could feel the allosaur's breath hot on his neck." Tim and the baby dinosaur escape into the Dinosaur Sea, just ahead of the allosaur which "was furious at seeing his dinner just out of reach."

After the baby dinosaur is safely returned to its mother, another roaring dinosaur comes out of the distance: the T–Rex Express, returning to take Tim back to his parents.

### Explorers in Dinosaur World

*Explorers in Dinosaur World,* also thirty pages long, is intended for children approximately eleven years old. The story centers on two siblings, Peter and Wendy. Peter, a dinosaur enthusiast, is dismayed when his sister wins a radio station contest to spend a weekend previewing "Dinosaur World's newest attraction—Pangaea—the island of mystery in the middle of Dinosaur Sea." By promising to do Wendy's chores for a year, Peter convinces Wendy to let him accompany her on the trip.

When they arrive at Dinosaur World, Peter and Wendy are met by their guide for the weekend, Jake DuMel, a designer of Pangaea. The trio sets off for the boat dock and Jake explains the tasks of all the uniformed workers they see on the way:

It takes a lot of people to run a place this big. Engineers for the T–Rex Express trains, guides for group tours ... keepers who help in the Nursery feeding the baby dinosaurs, gardeners to take care of all the plants and flowers and a staff of scientists who spend time studying the animals.

Pangaea, about a half-mile from the mainland, appears "ghostly and mysterious." As he loads the boat, Jake checks the children's gear, including a radio. Peter tells Wendy, "[w]e need it to call for help if we get into any trouble." Jake adds, "Dinosaur World is full of surprises, not trouble. Still, you can't be too careful...."

As they cross the Dinosaur Sea, the group is pursued by an elasmosaur, a large, serpent-like creature. The elasmosaur arches over the boat, flashing its sharp teeth. Fortunately, the creature becomes distracted by other prey, and Peter, Wendy, and Jake escape harm.

After the elasmosaur incident, the boat's engine fails and Jake begins to row the final distance to Pangaea. Another sea dinosaur, a "terrible" and "massive" kronosaur, threatens the trio, but they are able to lasso a passing sea turtle that pulls the boat quickly

across the water to Pangaea. The kronosaur roars "in frustration and anger" as it watches "its breakfast escape."

On Pangaea, "a world impossibly old and, at the same time, wondrously new," the group first see an apatosaur "bigger than a moving van." Then, a saltopus "no bigger than a cat" runs by "on its hind legs, bent over, balancing itself with its long tail." After this introduction to the animals of the island, the group walks into the center of the "breathtakingly beautiful" island. Jake warns Peter and Wendy about the deinonychus, carnivorous dinosaurs that "run like the wind, hunt in packs like wolves, are always hungry and have extremely long, sharp claws." Jake reassures them that "there are special fences that keep dangerous dinosaurs from wandering into the areas where we'll be going."

After a night camping on the island, during which Jake tells the children many dinosaur tales and the children keep a watchful eye on the forest beyond the campsite, Jake receives a warning on the portable radio:

[Radio]: Security reports a break in the perimeter fencing on the east side of the lake.

[Jake]: How bad is it, Main Base?

[Radio]: Bad enough. Tracking computers indicate a pack of deinonychus is on the loose, and Jake ... they're heading your way. Suggest you make for the chopper pad. We have a bird on its way now. You should have plenty of time to make it. Do you copy?

[Jake]: We're on our way.... You heard him. Let's go, kids.

As they rush to the helicopter pad, an ankylosaur, a bony-plated dinosaur with a club-like tail, blocks their path. From behind, a pack of deinonychus approaches. To avoid confrontation, the trio veers into the forest. As they watch, the ankylosaur fights off the deinonychus with its powerful tail. The group then reaches the helicopter pad and departs from Pangaea.

### Jurassic Park, The Novel

*Jurassic Park* is a 400–page novel written for an adult audience. As one would expect

from its length, it is a complicated story full of many plot twists. The basic plot outline is as follows:

Unregulated genetic engineering firms are making leaps and bounds in the field hoping for financial gains. The developing technology, however, can have disastrous consequences. One firm, InGen, suffered some sort of problem in the genetics work it performed on a remote island off Costa Rica. Though much of the affair has gone unreported, a few people are willing to reveal the events of the "InGen Incident." The tale is the story of *Jurassic Park.*

John Hammond, InGen's founder, has attempted to create a dinosaur zoo on the volcanic Isla Nublar, by cloning dinosaurs using DNA extracted from the remains of blood-gorged mosquitos preserved in amber. The park, which is set to open in a year, has fifteen different species of dinosaurs, over two hundred animals in all, in a computer-controlled environment combining state-of-the-art electronic and biological technologies. Several of the dinosaur species are carnivorous, the most vicious being the tyrannosaurus rex and the velociraptors, medium-sized carnivores that hunt in packs.

Several problems, among them the escape of small procompsognathid dinosaurs to the mainland and the death of three Isla Nublar workmen killed by velociraptors, have made the investors nervous about the venture's success. Hammond is forced to bring a team of specialists to the island to inspect the safety of the zoo.

The inspection team consists of Dr. Alan Grant, a paleontologist, Dr. Ellie Sattler, a paleobotanist, Ian Malcolm, a mathematician, and Dennis Nedry, a computer scientist. Malcolm believes in chaos theory, a primary theme of the novel, which posits that even simple systems engage in complex and highly unpredictable behavior. He has insisted since first learning of the dinosaur zoo that such a project would bring nothing but disaster.

On the island, the group first encounters brachiosaurs eating from the tops of trees. After this innocuous incident, the group travels to the island's headquarters, where they

soon discover some of the zoo's potential problems. In the nursery, they learn that the dinosaurs have been genetically engineered not to reproduce. Yet Grant later finds in the jungle a velociraptor eggshell fragment, leading him to suspect the dinosaurs have overcome their infertility. These fears are confirmed when the group learns that the electronic trackers that monitor the creatures indicate that there are several more dinosaurs on the island than were placed there by InGen. Also troubling is Sattler's discovery of some poisonous plant species on the island. Finally, the reader learns that Dennis Nedry has become a spy for Biosyn, a rival genetics firm. Nedry agrees to steal several dinosaur embryos for Biosyn in exchange for $1.5 million. These incidents foreshadow additional problems the island zoo will soon suffer.

Hammond's grandchildren, Tim and Alexis, arrive at the island. Although Hammond has ostensibly brought his grandchildren so that they may enjoy a sneak-peek at the dinosaurs, their real function is to convince the investors that the zoo is safe enough for children and will be extremely lucrative. The inspection team and the children set off with a guide to tour the park in automated Toyota Land Cruisers that run on a track. A pre-recorded program runs inside the cars, explaining the island's inhabitants to the group as they tour.

The tour progresses until a storm develops. Surveying the island, the tour guide sees that small velociraptors have boarded a supply boat leaving for Costa Rica. The group attempts to warn the boat by radio, but communications are down.

The reader learns that Nedry has shut down all the communications and security systems on the island in order to escape undetected with the stolen embryos. As he rushes to a boat dock, Nedry is caught in the storm and eventually violently killed by a dilophosaur on the loose.

Meanwhile, the Land Cruisers carrying the inspection team and the children have stalled. A tyrannosaurus rex attacks, tossing the children's vehicle over a precipice and mauling Malcolm. The tour group leader is soon killed by a baby tyrannosaurus rex, though the children, Grant, and the others manage to escape.

A tyrannosaurus rex chases a stampeding herd of dinosaurs. Later, the tyrannosaurus rex attacks Grant and the children as they try to escape by raft on a river, but the creature becomes distracted by other dinosaurs on land and the raft avoids disaster. The raft is then dive-bombed by a pterodactyl that nearly flies off with one of the children. Eventually, the group makes it back to the headquarters, where Sattler, Hammond, and others are trying to restore order to the island. Malcolm also is rescued and brought to headquarters, though he is severely injured.

Because the electric fences that usually separate the dinosaurs have been shut off, the dinosaurs are roaming free throughout the island. Velociraptors hunting in packs attack many people, killing some and narrowly missing others. The children are attacked by a pack while hiding in the headquarter's cafeteria, but they manage to trick the velociraptors into entering a giant freezer. Eventually, some of the attacking velociraptors are killed by poison, though many more remain in a nest that the surviving group of people attempts to destroy.

During this tumult, time has elapsed and now only an hour remains to contact the supply boat and warn it of its deadly cargo before it reaches Costa Rica. Just as the boat is about to reach shore, and with the help of Tim's computer knowledge, they make contact with the supply boat. The boat's crew kills the velociraptors. Grant, Sattler, the children, and others then contact Costa Rican rescuers.

Malcolm, near death, argues with Hammond that the park was doomed to failure from the beginning. Hammond stalks off, and is soon killed and eaten by procompsognathids. Malcolm also dies, succumbing to his injuries.[2]

2. What seems to us a clear case of death is made more ambiguous by the sequel to *Jurassic Park,* a novel entitled *The Lost World,* where Malcolm is again a central character.

As Grant, Sattler, the children, and the remaining island survivors escape by Costa Rican National Guard helicopter, Isla Nublar is bombed and the zoo is destroyed. An epilogue informs us, however, that some creatures have reached the mainland and appear to be migrating.

### Jurassic Park, the Movie

The movie version of *Jurassic Park* is just over two hours in length. Like most film adaptations, it eliminates many of the novel's details and some scenes are cut, such as the velociraptors on the supply boat. The chaos theory and genetic engineering themes of the novel are truncated. Some material is added, such as the inevitable Hollywood love interest between Dr. Grant and Dr. Sattler. The children's ages are reversed, and the sister becomes the more competent of the two. Some characters are eliminated or combined, and some character traits, notably those of Malcolm and Hammond, are softened. Malcolm and Hammond also have the good fortune to survive in the movie version. Hammond concedes at the end of the film that the zoo is a disaster, though the actual destruction of the island is not depicted in the movie, leaving the audience with a more ambiguous ending.

### DISCUSSION

Williams argues that the district court erred in granting summary judgment to the Appellees on the ground that there is no substantial similarity between the *Dinosaur World* books and the *Jurassic Park* works.

Summary judgment is mandated when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). We review *de novo* the district court's grant of summary judgment in favor of the Appellees.

*Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1071 (2d Cir.1992).

To establish copyright infringement, "two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991). The parties do not dispute that Williams obtained valid copyrights in the *Dinosaur World* books. Therefore, in order to prevail, Williams must show that the Appellees copied the *Dinosaur World* books. In the absence of direct evidence, copying is proven by showing "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works." *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994); *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139–40 (2d Cir.1992).

For purposes of the summary judgment motion, the Appellees have conceded that they had access to Williams's books. This case thus turns upon the second part of the test: whether, in the eyes of the average lay observer, the *Jurassic Park* works are substantially similar to the protectible expression in the *Dinosaur World* books. *See Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir.1994). If "the similarity concerns only noncopyrightable elements of plaintiff work," or "no reasonable trier of fact could find the works substantially similar," summary judgment is appropriate. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *see also Arica Inst.*, 970 F.2d at 1072.

It is "a principle fundamental to copyright law" that "a copyright does not protect an idea, but only the expression of an idea." *Kregos*, 3 F.3d at 663; *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 239–40 (2d Cir.1983). Similarly, *scenes a faire*, sequences of events that "necessarily result from the choice of a setting or situation," do not enjoy copyright protection. *Walker*, 784 F.2d at 50. The distinction be-

tween an idea and its expression is an elusive one. Judge Learned Hand provided the guiding principle to this often impenetrable inquiry in *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931):

> Upon any work, ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

Professor Chafee further defined the boundary between idea and expression, stating that "protection covers the 'pattern' of the work ... the sequence of events and the development of the interplay of characters." Zechariah Chafee, *Reflections on the Law of Copyright,* 45 Colum.L.Rev. 503, 513 (1945); *see generally* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.03[A] (1995).

Examples aid us in applying these abstract principles. In *Mattel, Inc. v. Azrak–Hamway Int'l, Inc.,* 724 F.2d 357, 360 (2d Cir. 1983) (per curiam), we found that a 5½ inch Warlord doll did not infringe upon a 5½ inch Masters of the Universe doll because, though the dolls looked remarkably similar, the similarities all were attributable to the unprotectible idea of "a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose." We found that protectible expression might only arise from the way the two dolls emphasized the idea, such as by accentuating certain muscle groups instead of others. *Id.*

An example of unprotectible *scenes a faire* can be found in *Walker,* 784 F.2d at 50, regarding stories of police work in the Bronx. We said that "[e]lements such as drunks, prostitutes, vermin and derelict cars would appear in any realistic work about ... policemen in the South Bronx," and thus are un-

protectible *scenes a faire.* Similarly, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction," not in and of themselves entitled to copyright protection. *Id.* As the court said in *Berkic v. Crichton,* 761 F.2d 1289, 1294 (9th Cir.), *cert. denied,* 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 69 (1985), "[t]he common use of such stock .... merely reminds us that in Hollywood, as in the life of men generally, there is only rarely anything new under the sun."

When we determine that a work contains both protectible and unprotectible elements, we must take care to inquire only whether "the *protectible elements, standing alone,* are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995); *see also Fisher–Price,* 25 F.3d at 123. We also must recognize that *dissimilarity* between some aspects of the works will not automatically relieve the infringer of liability, for "no copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated." *Rogers v. Koons,* 960 F.2d 301, 308 (2d Cir.), *cert. denied,* 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). It is only when the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of "small import quantitatively or qualitatively" that the defendant will be found innocent of infringement. *Id.; see also* 3 *Nimmer on Copyrights, supra,* § 13.03[B][1][a].

To apply the law to the dispute before us, we examine the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the *Dinosaur World* books and the *Jurassic Park* works. *See Walker,* 784 F.2d at 48; *Berkic,* 761 F.2d at 1292; *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976); *Green v. Lindsey,* 885 F.Supp. 469, 481–82 (S.D.N.Y.1992), *aff'd,* 9 F.3d 1537 (2d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1318, 127 L.Ed.2d 667 (1994). Having reviewed both parties' works in detail, we find that nearly all the similarities between the works arise from noncopyrightable elements, and thus

the district court correctly concluded that the works are not substantially similar.

■ Consideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is especially appropriate in an infringement action involving children's works, because children's works are often less complex than those aimed at an adult audience. *Reyher*, 533 F.2d at 91. Here, the total concept and feel of the two works differ substantially. The *Jurassic Park* works are high-tech horror stories with villainous characters and gruesome bloodshed. Books II and III of the *Dinosaur World* series, by contrast, are adventure stories and, although suspenseful in places, have happy endings. The threats and danger in Books II and III do not arise because of the evils of humans; rather, the threats exist because of the wild nature of dinosaurs and are intended to educate children about the behavior of these now-extinct creatures. The total concept and feel of the *Jurassic Park* works is of a world out of control, while Williams's Dinosaur World is well under control.

Turning to specific similarities in the theme, setting, characters, time sequence, plot, and pace, we also find that the Appellees' works are not substantially similar to the *Dinosaur World* books. Any similarity in the theme of the parties' works relates to the unprotectible idea of a dinosaur zoo. Once one goes beyond this level of abstraction, the similarity in themes disappears. The *Jurassic Park* works involve genetic engineering, ego, greed, and the consequences of man's hubris in believing that nature can be controlled. No similar themes are evident in any of the *Dinosaur World* books.

The settings of the parties' works also do not give rise to a finding of substantial similarity. While both the *Dinosaur World* books and the *Jurassic Park* works share a setting of a dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers, these settings are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo. Thus, though perhaps substantially similar, the settings are not protectible. Williams, however, points to the set-

ting of Book III on the island of Pangaea, a lush volcanic island not yet open to the public, and argues that this setting is a protectible expression of the dinosaur zoo idea. We disagree, finding both that Pangaea and Isla Nublar are distinct from one another (one is a man-made theme park attraction, the other a remote natural island) and that placing dinosaurs on a prehistoric island far from the mainland amounts to no more than a *scene a faire* in a dinosaur adventure story.

Williams contends that the children in Book III, Peter and Wendy, and the children in the *Jurassic Park* works, Tim and Alexis, along with the respective guides Jake DuMel and Dr. Grant, are substantially similar. It is true that both Peter and Tim are dinosaur enthusiasts, that both groups of children are siblings, and that both guides are intelligent. Likewise, we recognize that in both works the characters spend the night in the dinosaur zoo and escape from dangerous dinosaurs by helicopter through the combined wit of the children and adults.

These similarities, however, do not suggest infringement. As Judge Learned Hand advised, "the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols*, 45 F.2d at 121. Such can be said of Peter, Wendy, and Jake, all of whom are much less developed than their alleged counterparts. Setting that aside, however, the characters still do not appear substantially similar. When one looks beyond the superficial similarities in the characters, many differences emerge, including the motivations for the characters' trip to the dinosaur parks, the skills and credentials of the characters, and their interpersonal relationships. As a result, we find that no reasonable observer would find substantial similarity between the characters of the works at issue.

Finally, an examination of the time sequence, pace, and plot of the parties' works reveals no infringement. Book II takes place in the space of a day; Book III, in a twenty-four hour period. The *Jurassic Park* works, by contrast, involve a much longer timeline. Although the pace of the parties' works are similar, both quickly moving from

scene to scene, we agree with the district court that the pace, without more, does not create an issue of overall substantial similarity between the works.

The plot, or sequence of events, of the works likewise is not substantially similar. Although Williams points to several specific instances of similarity,[3] we agree with the district court that such lists are "inherently subjective and unreliable," particularly where "the list emphasizes random similarities scattered throughout the works." *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). Such a scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another. *See Walker,* 784 F.2d at 50; *Burroughs v. Metro–Goldwyn–Mayer, Inc.,* 683 F.2d 610, 624 (2d Cir.1982).

Additionally, even those scenes that appear similar in their abstract description prove to be quite dissimilar once examined in any detail. For example, in both Book III and the *Jurassic Park* movie, the characters escape deadly, pack-hunting dinosaurs (deinonychus and velociraptors, respectively) when another dinosaur (an ankylosaur and a tyrannosaurus rex, respectively) intervenes. However, the Book III dinosaurs are not purposefully hunting the human characters as the velociraptors are in the movie. In Book III, the intervening dinosaur is unsuspecting, non-threatening, but well-armored, whereas the tyrannosaurus rex in the movie is itself a marauding beast that has terrorized the characters throughout much of the action. The final scene of the movie, showing the tyrannosaurus rex roaring over the fallen velociraptors in the lobby of the island's headquarters, surrounded by a prehistoric skeleton of a dinosaur and banner that reads "When Dinosaurs Ruled the Earth" symbolizes the theme of man's hubris and emphasizes that nature cannot be controlled. An analysis of this scene and others leads us to conclude that a finding of substantial similarity cannot be supported.

When we consider the combined elements of the *Dinosaur World* books and compare them to the *Jurassic Park* works, we hold that a lay observer would not find substantial similarities between the protectible material of these works.

We must emphasize one final point. Williams rightly points out that his books, written for a young audience, deserve copyright protection as much as works created for an adult audience. Williams fears that unless he prevails, children's book authors everywhere will be stripped of the protection of copyright because adult book authors will be able to point to the greater complexity of their works as evidence that no infringement has occurred.

■ We answer Williams's concern in two ways. First, the copyright law is to be uniformly applied across a variety of media and audiences; *see, e.g., Smith v. Little, Brown & Co.,* 245 F.Supp. 451 (S.D.N.Y.1965) (adult-audience work allegedly infringed by children's work), *aff'd,* 360 F.2d 928 (2d Cir. 1966); *Rogers,* 960 F.2d at 308, 312 (photograph allegedly infringed by sculpture); *Horgan v. Macmillan, Inc.,* 789 F.2d 157, 162 (2d Cir.1986) (ballet choreography allegedly infringed by photographs of ballet). The law takes into account Williams's concern by requiring the lay observer to focus on similarities rather than differences when evaluating a work. Only when the similarities are insubstantial or unprotectible will a claim fail.

Second, Williams's claim fails here largely because the similar parts of the parties'

---

**3.** These include: encounters with small dinosaurs in Books I, III, and the *Jurassic Park* novel; encounters with brachiosaurs in Book II and the *Jurassic Park* movie; visits to dinosaur nurseries in both Book II and the *Jurassic Park* works; tours with automated vehicles and recorded guides in Books II, IV and the *Jurassic Park* works; stranded characters encountering ferocious dinosaurs in Book II and the *Jurassic Park* works; characters in boats being pursued by dinosaurs in Book III and the *Jurassic Park* novel; dinosaurs escaping from paddock fences in both Book III and the *Jurassic Park* works; and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur and a helicopter in Book III and the *Jurassic Park* movie.

works are unprotectible *scenes a faire* or trivial, scattered details. We know of many stories written for children that are more detailed in characterization and plot than Williams's books, and likewise can think of several adult novels that are less original. The claim would be equally weak if the *Jurassic Park* works had preceded the *Dinosaur World* books, and the Appellees had attempted to sue Williams. Thus, it is not the distinction between children's books and adult books, but rather the degree of similarity between these particular dinosaur adventure stories that compels our holding in this case.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the Appellees.