**Emilio SINICOLA, Plaintiff,**

v.

**WARNER BROS., INC.,
et al., Defendants.**

No. CV 94–4285.

United States District Court,
E.D. New York.

Dec. 31, 1996.

Michael J. Greenfeld, Valley Stream, NY, for plaintiff.

Franklin, Weinrib, Rudell & Vassallo by Neil J. Rosini, New York City, for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff Emilio Sinicola brings this action against defendants Warner Bros., Inc. ("Warner Bros."), Warner Home Video ("WHV"),[1] and Steven Seagal ("Seagal") (collectively, "defendants"),[2] claiming defendants infringed plaintiff's copyright in an unpublished novel entitled "The Family ... and Some" (the "Novel") by and through their motion picture entitled "Out for Justice" (the "Film"). Presently before the Court is defendants' motion for summary judgment to dismiss plaintiff's amended complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons below, the motion is granted.

## I. BACKGROUND

### A. The Parties and the Plaintiff's Claim

Defendant Warner Bros. is engaged in film production and distribution. WHV is engaged in distribution of videotapes of film productions for home viewing. Seagal is a screen actor and producer of films. Warner Bros. produced the Film in 1991 and distributed it throughout the world. WHV distributed the Film on video tape for home viewing. Seagal portrays the main character in the Film and is identified in the credits of the Film as one of the Film's producers. The Film was a relative box office success, earning Seagal in excess of one million dollars.

Plaintiff maintains that in 1976 he created and authored the Novel. Thereafter, he attempted to have the Novel published or made into a screen play. He submitted a manuscript of the Novel to various persons, including agents, sales managers, and producers, none of whom, defendants maintain, has any connection with defendants. Plaintiff claims that defendants infringed plaintiff's copyright in the Novel by and through the Film.

For purposes of this motion only, defendants do not dispute that plaintiff is the owner of a valid copyright in the Novel, and that defendants had access to the Novel. Thus, the Court must determine if there are genuine issues of material fact as to whether the two works are substantially similar as to copyrightable elements of plaintiff's work. In reaching its determination, the Court has read the 334–page Novel and viewed the 91–minute Film (in addition to reviewing the parties' briefs and other submissions). The following is a brief description of the Novel and the Film.

### B. The Works

#### 1. The Novel

The Novel is set primarily in an Italian–American neighborhood in Manhattan, New York, beginning in the summer of 1947. Most of the story is recounted in the first person by Vince Accola, the Novel's protagonist, a 17–year–old high school basketball star at the time. The events of the Novel take place over approximately two years.

As the Novel begins, Vince's father, Salvatore, and brother, Paul, are innocent bystanders who are shot and killed after witnessing the murder of a friend, Ralph Gaetano, a reputed mobster, in the apartment building where Vince and his family live. With his father's and brother's deaths, Vince has become the "head of the family," expected to look after his mother, Jennie, and sister, Helen, as he prepares to enter his last year of high school.

The police, led by a homicide detective named Kelly, investigate the murders, but are unsuccessful in identifying the killers. Vince and his uncle, Gino Accola, vow to find the killers and avenge the murders of their family members, as they are certain the justice system will not adequately punish the killers if they are caught.

---

1. Defendants indicate that Warner Bros. and WHV are divisions of Time Warner Entertainment Company L.P., and that plaintiff incorrectly refers to each of them as "a Time Warner Co."

2. Plaintiff also names as a defendant David Henry Lee a/k/a Lance Hill ("Lee"). However, Lee has not been served with, and has not responded to, the complaint.

Uncle Gino is a large, powerful man who emigrated from Italy at a young age. He speaks in broken English and works as a handyman. He is regarded by others in his community as gentle and benevolent, caring deeply for his family, particularly Vince, whom he treats and loves like a son.

Vince and Uncle Gino soon learn the identity of one of the killers from a resident of their apartment, Julia. Julia tells Vince and Uncle Gino that she saw the killers pursue Ralph Gaetano to the roof of the apartment building and then flee via the fire escape; she also saw them drop something in a garbage can as they fled. The discarded objects were silencers, which she had retrieved from the garbage can and handed to Uncle Gino. She then tells them that one of the killers—identified by a conspicuous tattoo of the devil on his wrist—is a local mobster named Frankie "Eyes" Rizzo, a ruthless thug.

After a closed-casket funeral for Vince's father and brother, the local mob boss, Vittorio, invites Uncle Gino and his family to live in an apartment building above the social club that the mob uses as a hangout in exchange for Uncle Gino's handyman services at the club. The offer is made out of sympathy for Gino's family, as Vittorio is unaware of the killers' identities. Consequently, Uncle Gino and his wife (Vince's Aunt Rosa), Vince, and Vince's mother and sister move into an apartment above the club. Over time, Uncle Gino, Aunt Rosa, and Vince's mother become fond of Vittorio, who bears an uncanny resemblance to Vince's slain father, and who has moved into another apartment above the club. In fact, Vince's mother and Aunt Rosa often cooks meals for Vittorio.

In the meantime, the early chapters of the Novel focus extensively on Vince's childhood and high school friendships and experiences, including racial riots (between blacks and whites and between Irish and Italians), his basketball successes (culminating in a championship game at Madison Square Garden), and his early sexual encounters (with prostitutes and his high school history teacher). Before a tryst with his history teacher, Vince goes to a local candy store to purchase condoms. The candy store is owned by a former prize fighter named "Johnny Vito," who once fought in Madison Square Garden. The candy store also functions as the mob's local gambling center, activities which are protected through police payoffs. While Vince is leaving the candy store, he is confronted by an Irish police detective, Detective Finn, who is there with other officers of Irish descent to extort protection money from the proprietor. Finn recognizes Vince as a participant in a riot at a local high school football game between the Italian fans and players of Vince's brother's high school and the Irish fans and players of the opposing school. With tension apparently high between the neighborhood's Irish police officers and its Italian residents, Finn makes an ethnically insulting reference to Vince. To humiliate Vince further, Finn takes the condoms from Vince's hand, holds them up, and refers to them as "Italian sausage holders." He pushes Vince around, but is prevented from doing so further by Vito's threat to stop the payoffs should the cops harm Vince. Vito further warns the corrupt police officers that "if you weren't cops, you would be getting your asses pushed in."

As the Novel progresses, Uncle Gino meticulously plans his revenge. While he plays the humble handyman at the club, where the mobsters refer to him as "Greezer," he plans the murder of Frankie "Eyes," a regular at the club. Uncle Gino allows himself and Vince to be used by Frankie as "patsies" in a drug deal—a heroin buy Frankie and two others arranged without the mob's knowledge, because the mob bosses prohibited members from dealing in drugs. As part of Frankie's scheme, Frankie purchases a car for Uncle Gino from a New Jersey car dealer, Carl Bino. Carl, who is indebted to Frankie, fears Frankie and is easily bullied by him. Frankie instructs Carl that he is not to tell anyone that Frankie bought a car for Uncle Gino. Frankie tells Uncle Gino that the deal involves the purchase of valuable lamps and requests that Uncle Gino drive the car to assist in the deal, despite realizing that Gino is a terrible driver. In preparing for the buy, Uncle Gino, Vince, and Frankie drive to a house in Staten Island. There, Frankie has Uncle Gino and Vince empty cartons of stolen dental supplies from a hid-

den compartment under a trapdoor in the floor of the house. He also has Uncle Gino make certain repairs to a crack in the concrete within the compartment because it emits a foul odor. Uncle Gino discovers guns, silencers, and bullets in the compartment, which Vince refers to as "Devil's Hole." All the while, Uncle Gino secretly plans his revenge against Frankie.

As he pursues Frankie, Uncle Gino's passion for revenge, capacity for violence, and sense of justice become clear to Vince, particularly as Vince recalls a story his father once told him. As his father told him, back in Italy Vince's grandfather (Salvatore's and Gino's father) had a dog which was named "CoCo" for its "sudden outbreaks of crazy actions." CoCo was bludgeoned, decapitated, and buried by two dirt poachers when it threatened them. Upon investigating and learning the poachers' identities, Uncle Gino and Salvatore, armed with a hatchet and a razor, set out for the poachers. When they caught the poachers, Uncle Gino smashed each one over the head with a wooden staff and severed a portion of one ear of each. The brothers fled to the United States after that incident to avoid arrest. Uncle Gino's resolve to exact vengeance on his own terms clearly troubles Vince, and Vince becomes distracted, anxious and frightened, doubting his own ability to carry out the killing.

Once the heroin is purchased, Uncle Gino, Vince and Frankie drive to the Staten Island house. There, Uncle Gino ambushes Frankie. In pleading for his life, Frankie blames another mob member, Eddie "Blimp" Velella, for Vince's father's and brother's murders. Eddie is one of Frankie's partners in the heroin deal and another regular at the social club. Uncle Gino tortures and mutilates Frankie, cutting off Frankie's penis and nailing it to Frankie's forehead with a hammer and a spike he brought with him in a tool chest. Uncle Gino guides Vince to Frankie's corpse, places a gun in Vince's hand, and directs Vince to shoot Frankie's "stilled body." Although sickened by his uncle's brutality, Vince reluctantly complies. They then dump Frankie's body, the heroin, the guns, and the stolen dental supplies into the hidden compartment and fill it with concrete, leaving only a two-foot space to the top of the trapdoor.

Meanwhile, Vince has decided to attend college in upstate New York at Vincentian University in Niagara, where he is a highly-touted basketball recruit. After Frankie's murder—over one year after Vince's father's and brother's murders, Vince leaves for college, where he continues playing basketball and where he becomes romantically involved with another student. The Novel focuses significantly on Vince's college experiences, including basketball, his new friendships and college sweetheart, and his confrontations with the school's star football player (an obnoxious brute, whose car Vince and his friends push into a pond on campus because they are "fed up" with him).

During the Christmas break, Vince's mother, Uncle Gino, and Aunt Rosa make a surprise visit to Vince at college. During the visit, Uncle Gino tells Vince, who is troubled by guilt over Frankie's murder, that he no longer plans to kill Eddie and that he plans to move back to Italy—partly because he believes that he must leave if his widowed sister-in-law is ever to become romantically involved with another man. Vince is relieved, believing there will be no further killing. Nevertheless, Uncle Gino secretly plans to kill Eddie on his own.

Following Frankie's disappearance, Carl—the car dealer from New Jersey—visits Vittorio. Carl believes he may have been the last one to see Frankie. He also believes that if he provides helpful information to Vittorio, he may be able to obtain a loan for his sagging business. Carl tells Vittorio that Frankie recently purchased a car from him for Uncle Gino. Already concerned by Frankie's mysterious disappearance, Vittorio immediately confronts Uncle Gino, perplexed by Carl's revelation. Uncle Gino admits that Frankie bought him a car; however, he tells Vittorio that the car was in exchange for Uncle Gino's handyman services and that he has not seen Frankie since before Frankie disappeared. Carl then requests, and obtains, a loan from Vittorio.

Eddie, and the other participant in the foiled heroin deal, Steve Cohen, have also grown suspicious following Frankie's disap-

pearance. Cohen is in constant fear for his life, particularly from Eddie. Apparently, Cohen knows too much. He not only participated in the foiled heroin deal (to settle his gambling debts), but he knows that Frankie and Eddie murdered Ralph Gaetano and the two innocent onlookers. To get even with Eddie, if Eddie should kill him, Cohen writes a letter to Vittorio disclosing Frankie's and Eddie's involvement in the foiled heroin deal and the murders. Cohen directs his sister to deliver the letter should anything happen to him. Unfortunately, Cohen and his wife are killed when a tractor-trailer jack-knifes on a rain-slicked road and forces their car off the road as they are returning from a trip to upstate New York.

Following Cohen's death, Cohen's sister's husband, Sam—a former mob member known as "Sammy Threads"—delivers the letter to Vittorio. Upon learning of Frankie's and Eddie's involvement in the foiled heroin deal and the murders, Vittorio explodes, condemning them for dealing in drugs—an activity forbidden by the mob—and for killing Ralph Gaetano and innocent people. Vittorio convenes a meeting of mob bosses. At the meeting, the bosses unanimously decide that Eddie must be killed, that his death be one of torture, and that his body should be found to serve as a lesson to anyone who would dare defy the mob bosses. Vittorio arranges to have Eddie murdered under the guise of having Eddie run a mob operation from a hotel in the city.

As basketball season ends at college and Easter approaches, Vince returns home for Uncle Gino's farewell party for Gino's family and neighborhood friends. The party is thrown by Vince's sister, Helen, and her fiance, Pat Vecchio, whom Helen began seeing shortly after her father's and brother's murders. Pat is a police officer, but he eventually leaves the force to become a firefighter after his corrupt colleagues pressure him to obtain information about Vittorio. Vince invites two of his basketball teammates to attend the party and to see his home and neighborhood. Vittorio and one of his henchmen also attend. As he is eating, Vittorio compliments the decorations of flowers and wax grapes in the apartment. Aunt Rosa

tells him that flowers and grapes have been a "trademark" in the Accola family for many years, and that Salvatore, Gino's late brother, enjoyed growing flowers. After Vince's two teammates go home, his college sweetheart, Dee, comes to meet his family and spends Easter with them.

Unknown to the mob, Uncle Gino continues planning Eddie's murder. Uncle Gino "bait[s] the trap," hinting to Eddie that he has a package for him from Frankie. Taking the bait, Eddie arranges to meet Uncle Gino at the hotel where Eddie is operating. When Uncle Gino meets Eddie at one of the hotel's rooms, ostensibly to give him the package, Uncle Gino drives a meat clever into his head. Uncle Gino places a bag over Eddie's head, pulls a wire through a drawstring loop in the bag, and strangles Eddie. He then pins flowers and wax grapes—which he brought, with the meat clever and bag, from his apartment—to Eddie's corpse in the form of a cross.

The hitmen sent by Vittorio to kill Eddie arrive at the hotel room later that night to find Eddie already murdered, his corpse decorated with the symbols of Uncle Gino's revenge. Nevertheless, they dispose of Eddie's body under the Coney Island boardwalk as though it were a mob "hit."

Shortly after Eddie's murder, Vince returns from college to bid Uncle Gino farewell on his voyage to Italy. Vittorio also appears at the dock to bid Uncle Gino farewell. After being told the circumstances of Eddie's murder, Vittorio realizes, with admiration, that Uncle Gino probably killed Frankie and Eddie, as Vittorio apparently recalls the flowers and wax grapes from Gino's farewell party. The story ends as Uncle Gino's ship pulls away.

Although a substantial portion of the Novel is on Vince's and Uncle Gino's revenge, much of the Novel's focus concerns Vince's transition from boyhood to manhood, exploring Vince's psychological and emotional changes as he mourns the deaths of his father and brother, deals with his role as the man of the house, confronts the methodical planning and killing of Frankie "Eyes," contemplates his mother's and Uncle Gino's relationships with Vittorio, and faces the transition from high

school and his urban Italian–American neighborhood to college and the rural surroundings of upstate New York. As noted, a substantial portion of the Novel details Vince's sexual encounters and romantic interests, including his high school history teacher, prostitutes, and college sweetheart, and his high school and college friends and experiences, particularly his basketball successes. In addition, the Novel focuses significantly on Vince's evolving relationships with his mother, sister, Uncle Gino, and Aunt Rosa.

## 2. *The Film*

The events of the Film are set in contemporary Brooklyn, New York, and occur principally during a single day. Bobby Lupo, a police narcotics detective, is shot and killed in front of his wife and children and other witnesses in broad daylight on the streets of the Italian–American neighborhood in Brooklyn where he and his partner and long-time friend, Gino Felino, were raised. Gino, played by Seagal, is a tough, streetwise, ponytailed, police narcotics detective in his 30's or 40's. Gino learns of the shooting while at his estranged wife's house preparing to play baseball with his young son, Tony, during a visit. Gino immediately leaves for the crime scene, and Tony walks away dejected. Gino's work apparently has interfered again with his family life.

At the crime scene, Gino learns that Richie Modono is the killer. Richie, a drug-using local hood, grew up in the same neighborhood as Gino and Bobby. Gino immediately sets out to capture Richie and avenge Bobby's murder. Gino requisitions an unmarked police car and a shotgun from his police supervisor, Ronny, and without hesitation, or even a pretense of secrecy, pursues Richie. Indeed, another police officer at the crime scene urges Gino to catch the "son-of-a-bitch." Meanwhile, Richie commits another cold-blooded killing, shooting an innocent woman in the head as she sits in her car.

Richie is fully aware of Gino's pursuit. As Gino pursues him, Richie gathers his associates and recruits other henchmen. Indeed, in a scene before Bobby's murder, Richie shows his associates a locked vault, in an industrial space, filled with money, tells them he must attend to unfinished business, and offers the money to them if they stick with him. Among his numerous henchmen are hoods named "Joey," "Paulie," "Frankie," and "Buchi," who has a tattoo of the devil on his neck.

Richie's family is also aware of Gino's pursuit of Richie. In fact, Gino tells Richie's parents, whom he has known since childhood and deeply respects, that he will kill Richie unless Richie surrenders to the police.

While Gino pursues Richie, the local "mob" also seeks to kill Richie because he disrespectfully killed Bobby on the mob's streets. In a scene shortly after the murder, a high-ranking mob member named "Frank" (also referred to as "Frankie") receives a phone call from someone named Bruno and is informed, in Italian, that Richie just killed Bobby. Frank, who is sitting with several associates at the time, directs his associates to catch Richie before the police do and to bring Richie to him; he also directs them to leave Gino alone. Shortly thereafter, Gino meets with Frank and the mob boss, Don Vittorio. Gino grew up around these mobsters and clearly does not fear them, as is evident from his exchange of words with a mobster there named Sammy. At the meeting, Vittorio expresses his sincere regrets over Bobby's murder, but denies that Richie is one of his members. Vittorio insists that Gino allow Vittorio and his associates to deal with Richie. Vittorio tells Gino that Richie has disgraced the mob by murdering "an innocent man in front of his family" on "my sidewalk," and if caught by the cops he may get away with only "seven to ten [years in prison], maybe!" Vittorio adds, "He must be dealt with by us. But I promise you, I will teach this man the price of our blood." Although Gino tells Vittorio he respects him, Gino refuses Vittorio's wishes; Gino tells Vittorio, "God forbid I find this guy before you do, you know what I'm going to do."

While searching for Richie, Gino remains in contact with his supervisor, Ronny. Ronny dispatches additional policemen, one of whom is named "O'Kelly," to assist Gino.

During his search for Richie, Gino rescues a puppy after it is tossed onto the street

from a car driving ahead of his car. Gino keeps the puppy and names it "Corragio" for its courageous character. Perturbed by the actions of the man who tossed the puppy from the car, Gino vows revenge should he "run into this guy someday."

In pursuing Richie, Gino displays expert skills in driving and martial arts, readily dispensing with Richie's associates, mostly in group onslaughts, as they attempt to impede his search for Richie. One such confrontation occurs in a local butcher shop where Gino is ambushed by several of Richie's henchmen. In the attack, Gino takes a meat clever away from one assailant and stabs another through the hand with it, pinning that assailant's hand to a wall. Another occurs in a bar owned by Richie and managed by Richie's tough-talking, younger brother, Vinnie, who is approximately 25 to 30 years old. The bar is used as a local drug and gambling operation and a hangout for Richie's associates. During the confrontation at the bar, Gino repeatedly demands to know Richie's whereabouts. When he fails to get a response, Gino taunts various hoods, including a heavy set thug covered in tattoos and Sammy, whom Gino is surprised to find at Richie's bar, having encountered Sammy earlier when he met with Vittorio. Perturbed at Gino's arrogance, Sammy tells Gino that "if you didn't have that badge and that gun, these guys would take your head off." At one point, Gino holds up a hot dog to a hood at the counter and, in a phallic reference, asks, "Whose hot dog is this? Is it yours?" Gino also punches out the bartender, a former boxer who decorated the bar with boxing memorabilia. When the hoods attack him, Gino pummels them using a variety of weapons, including a pool stick and a cue ball wrapped in a towel. Before leaving, Gino bloodies Vinnie's nose after Vinnie pulls a gun on him.

Meanwhile, the mob continues its search for Richie. The local news identifies Richie as one of the mob's members, causing the mob undesired publicity and police crackdowns of the mob's operations. As a result, Vittorio requests another meeting with Gino. At the meeting, Vittorio complains about the police crackdowns, but Gino ignores his pleas. Gino tells Vittorio that he never really liked him and doesn't care if he is arrested and rots in jail, but Vittorio does not believe Gino's professions.

As Gino and the mob continue their pursuit, Richie and his associates hide in a "chop shop"—a garage where stolen vehicles are reduced to parts—run by "Chas the Chair," its wheel-chair bound owner. Richie demands a car and scanner from Chas. Moments later, the police burst in, apparently tipped-off to Richie's whereabouts. Richie then shoots Chas, accusing him of "rat[ting] [him] out." Richie and his associates flee in a car before the police can apprehend them.

Upon hearing over the scanner that Gino is going to his apartment to meet his wife and son, Richie directs a number of his henchmen to Gino's apartment. At the apartment, Gino is attempting to reconcile with his estranged wife. When Richie's henchmen attack, Gino kills all of them, shooting six and pushing one off the fire escape.

After hearing over the scanner that Gino has killed his henchmen, Richie and his associates proceed to the bar. At the bar, Richie smacks Vinnie around, perturbed that Vinnie was spineless in not killing Gino when he had the chance and allowing Gino to bloody his nose. Richie boasts to Vinnie that when him and Gino bang heads, "they're gonna have to rack [Gino] up in a closed casket." Vittorio's henchmen arrive at the bar moments later. As they do, Richie tells Vinnie to get his gun. When Vinnie says he can't do it and whines, Richie punches him out and tells him he never wants to see him again. As Vittorio's henchmen enter the bar, Richie and his associates gun them down. Richie finishes off one of them by shooting his already prone body.

In the meantime, while investigating Bobby's murder, Gino arrests Richie's sister, Patti, in hopes of gaining information on Richie's whereabouts. Gino keeps her in a holding pen at the station and falsely charges her with prostitution when she refuses to cooperate. Gino later searches Bobby's desk at the police station and finds drugs, stacks of money, and sexually explicit photographs of Bobby with a woman who is not Bobby's wife. Gino shows Patti one of the photo-

graphs, but Patti is still unwilling to cooperate for fear Richie will harm his own family if they assist the police. Gino later learns from a cocktail waitress, Terri, who was also having an affair with Bobby, that the woman in the photographs is Richie's girlfriend, Roxanne. Gino goes to Roxanne's apartment with Terri and discovers that Roxanne was viciously murdered approximately 24 hours before Bobby's murder. Gino finds photographs next to Roxanne's body. Although the viewer does not see the photographs, apparently they are sexually explicit photographs of Bobby and Roxanne. Gino determines that Richie murdered Roxanne and Bobby after Richie learned of Bobby's affair with Roxanne. Gino confronts Bobby's widow and finds a bloodied photograph in her pocketbook. Although the viewer is aware that Richie left a photograph on Bobby's body when he killed him, the photograph apparently was removed by Bobby's wife before the police arrived. Gino determines that Richie learned of the affair from Bobby's wife, who, in a jealous fit, sent Richie sexually explicit photographs she found of Bobby and Roxanne. Gino realizes Bobby was not an innocent victim, but a "dirty cop" involved in drugs and caught in an extramarital affair.

By evening, Gino is tipped-off by a local kid that Richie and his associates are at a prostitute's apartment next to where the kid's uncle lives. Gino drives to the apartment and quietly enters with his shotgun. Gino first disposes of Richie's associates, and then battles Richie in protracted hand-to-hand combat, which culminates in the kitchen. After Richie uses various kitchen utensils as weapons, Gino takes a corkscrew from Richie's hand and drives it through Richie's forehead, killing him instantly. When Frank and other mob members arrive moments later, Gino takes Frank's gun and repeatedly shoots Richie's dead body to make the killing look like a mob "hit." Gino even suggests to Frank that Frank "do the ritual thing" and "put him in a . . . trunk in Jersey."

Within a couple days, in the last scene of the Film, Gino and his wife are walking on the Coney Island boardwalk with the puppy when they fortuitously encounter the man who tossed the puppy from the car. Gino confronts the man and words are exchanged. After the man attacks Gino, Gino kicks him in the groin, knocking him to the ground. The Film ends as the puppy urinates on the man's face.

## II. DISCUSSION

### A. Summary Judgment Standard

A party seeking summary judgment must demonstrate that "there is no genuine issue of any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. See Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57 (2d Cir.1987). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### B. Copyright Infringement

#### 1. Elements of Claim

To establish a claim of copyright infringement, plaintiff must establish: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 1296, 113 L.Ed.2d 358 (1991); Williams v. Crichton, 84 F.3d 581, 587 (2d Cir.1996); Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986). As noted above, for purposes of this motion only, defendants do not contest the validity of plaintiff's copyright. As for the latter element, because direct evidence of unauthorized copying is rarely available (and plaintiff prof-

fers none), plaintiff may prove copying circumstantially by showing that defendants had access to the copyrighted work and there exists substantial similarity of protectible material in the two works. *Williams,* 84 F.3d at 587; *Walker,* 784 F.2d at 48; *Warner Bros., Inc. v. American Broadcasting Cos.,* 654 F.2d 204, 207 (2d Cir.1981) (*Warner I* ); *Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976). As noted above, for purposes of this motion only, defendants do not dispute access. To prove copying, therefore, plaintiff must show (1) that the two works are substantially similar, and (2) that such similarities relate to copyrightable material. *See Williams,* 84 F.3d at 587; *Walker,* 784 F.2d at 48; *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 240 (2d Cir.1983) (*Warner II* ).

On a motion for summary judgment, noninfringement may be determined as a matter of law where " 'the similarity concerns only noncopyrightable elements of plaintiff work,' or 'no reasonable trier of fact could find the works substantially similar.' " *Williams,* 84 F.3d at 587 (quoting *Walker,* 784 F.2d at 48); *Warner II,* 720 F.2d at 240; *Littel v. Twentieth Century Fox Film Corp.,* 1995 WL 404939, at *3 (S.D.N.Y. July 7, 1995), *aff'd,* 1996 WL 47971 (2d Cir. Feb. 2, 1996). Moreover, in determining substantial similarity, the general test is " 'whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.' " *Warner I,* 654 F.2d at 208 (quoting *Ideal Toy Corp. v. Fab–Lu Ltd.,* 360 F.2d 1021, 1022 (2d Cir.1966)); *see Williams,* 84 F.3d at 587; *Littel,* 1995 WL 404939, at *3; *Smith v. Weinstein,* 578 F.Supp. 1297, 1302 (S.D.N.Y.), *aff'd,* 738 F.2d 419 (2d Cir. 1984).

### 2. *Copyright Protection*

It is axiomatic that copyright protection extends only to the particular expression of an idea, not to the idea itself. *Williams,* 84 F.3d at 587; *Walker,* 784 F.2d at 48; *Reyher,* 533 F.2d at 90. As the Second Circuit recognizes, this distinction is easier to state than apply. *Walker,* 784 F.2d at 48. Judge Learned Hand articulated the idea/expression distinction in his often-quoted "abstractions" test:

> Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931).

Thus, to prove his claim of infringement, plaintiff must prove that defendants took more than the ideas or thematic concepts of his work; he must prove defendants took the work's particular expression through "similarities of treatment, details, scenes, events and characterization." *Reyher,* 533 F.2d at 91; *Smith,* 578 F.Supp. at 1302. For example, in *Reyher,* the Second Circuit found no copyright infringement between two works presenting the thematic concept of a lost child who describes his mother to strangers as the most beautiful woman in the world, but when the child finds his mother, she turns out not to be beautiful to others. *See Reyher,* 533 F.2d at 90. Similarly, in *Nichols,* the Second Circuit concluded that "[a] comedy based upon conflicts between Irish and Jews, into which the marriage of their children enters, is no more susceptible of copyright than the outline of Romeo and Juliet." *Nichols,* 45 F.2d at 122.

Copyrights also do not protect "*scenes a faire,*" *i.e.,* "sequences of events that 'necessarily result from the choice of a setting or situation.' " *Williams,* 84 F.3d at 588–89 (determining that similarities in works' settings all flow from uncopyrightable concept of a dinosaur zoo); *see also Computer Associates Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 715 (2d Cir.1992) (elements of a work that " 'follow naturally from the work's theme rather than from the author's creativity' " are *scenes a faire* (quoting 3 Melville B. Nimmer

& David Nimmer, Nimmer on Copyright § 13.03[F][3], at 13–65 (1991))); *Reyher,* 533 F.2d at 91 ("Copyrights ... do not protect ... scenes which necessarily must follow from certain similar plot situations."); *see generally* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[B][4], at 13–82 to –84 (1991). *Scenes a faire* are also said to refer to "incidents, characters or settings which, as a practical matter, are indispensable or standard in the treatment of a given topic." *Walker v. Time Life Films, Inc.,* 615 F.Supp. 430, 436 (S.D.N.Y.1985), *aff'd,* 784 F.2d 44 (2d Cir.), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *see generally* 1 William F. Patry, Copyright Law & Practice, at 337–38 (1994) ("Although *scenes a faire* are occasionally analyzed as a copyrightability issue, the better approach is to regard the doctrine as relevant only to the scope of protection, since there will typically be expression in the treatment of stock scenes, and since it will be a rare work that consists entirely of *scenes a faire.*" (Footnotes omitted)). Thus, copyright protection does not extend to " 'stock' themes of a particular genre." *Walker,* 784 F.2d at 50; *see Williams,* 84 F.3d at 588; *see also American Direct Marketing, Inc. v. Azad Int'l, Inc.,* 783 F.Supp. 84, 95 (E.D.N.Y. 1992) (describing *scenes a faire* as "[m]aterial or themes commonly repeated in a certain genre").

Similarly, copyright protection does not extend to "familiar 'stock figures,' borrowed from the public domain," *Littel,* 1995 WL 404939, at *3; *see also Nichols,* 45 F.2d at 121–22 ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

### 3. *Comparison of the Works*

■ A comparison of the Novel and the Film immediately reveals profound differences in the overall works. The overall effect of the Film is that of a visceral, action-packed succession of violent confrontations, culminating in the villain's death at the hands of the avenger.[3] The Film overwhelmingly focuses on Gino's quest for revenge and contains various interrelated characters. Gino Felino, the Film's protagonist, is an experienced police detective in his late 30's or 40's, skilled in martial arts. Upon learning the identity of his partner's killer at the crime scene, Gino immediately seeks revenge, acting openly and in the line of duty. He repeatedly faces confrontation with unrepentant physical force. By the evening of the day of the murder, after numerous violent physical confrontations, Gino has uncovered the sordid truth behind his partner's murder and has exacted his own form of justice.

By contrast, the Novel is neither action-packed nor filled with violent confrontation and contains various unrelated or loosely related story lines and characters. The Novel's central protagonist, the late 1940's teenager, Vince, and his uncle, Gino, are ordinary citizens who vow revenge out of their love for their innocent, murdered relatives. Their revenge is hatched and executed in secrecy over a nearly two-year period through cunning and deception. Over that time, the Novel explores the psychological and emotional dilemma of young Vince's conflicting desires to avenge the murders and to avoid further bloodshed, while focusing extensively on the details of transforming events and experiences in his life, such as his sexual experiences and athletic successes. The Novel also focuses extensively on Vince's relationships to persons strongly influencing his life, many having no discernible bearing on the tale of revenge. The emphasis and attention to these details makes the Novel

---

**3.** Indeed, the Film is described on the jacket of the home video as follows:

> Out for action? You found it! Steven Seagal ... hits like nobody else can in the smash-'em-up police thriller <u>Out for Justice</u>.
> The place is Brooklyn, the time is now and the cop is Gino Felino (Seagal), born and raised in "the neighborhood." Gino's seen many changes but some things he can't accept. A boyhood adversary ... has taken a different

path, turning local streets into war zones. He's a mad dog unleashed, whom Gino's more than willing to send to an eternal obedience school. But he must catch him first.
> [The director] propel[s] a story that moves like a man running across hot bricks. At center stage, of course, are Seagal and his remarkable skills of Aikido, the most difficult of the martial arts. For actions fans, <u>Out For Justice</u> is outasight!

largely a biographical portrait of a young man living in the late 1940's facing the transition from the innocence of boyhood to the reality of manhood, triggered by the tragic deaths of his innocent father and brother. The tale of revenge serves as one vehicle for that transition, with the revenge killings largely motivated and carried out by Vince's Uncle Gino. Unlike the Film, the Novel is hardly driven by its central protagonist's thirst for vengeance.

Plaintiff concedes there are many significant distinctions in the overall works, but contends that the infringement is found in defendants' copying of those aspects of the Novel dealing with Vince's and Uncle Gino's revenge. In opposing defendants' motion, plaintiff lists 32 purported "substantial similarities" between the two works and identifies overlapping character names. Even comparing the Film with those aspects of the Novel dealing with the tale of revenge, a close review reveals that, despite plaintiff's creative arguments, many of the purported "substantial similarities" in events, characters, and settings are nonexistent or insignificant, while the remaining ones concern unprotected ideas and thematic concepts or merely *scenes a faire* and stock figures.

■ At a most general level, both works tell a story of a villain, linked to organized crime, who commits a homicide and then is pursued and vanquished by a close friend or relative of the victim before other characters who were hoping to capture the villain for their own purposes. However, one cannot monopolize a story at this level of abstraction; such a stock theme is not protected by copyright. *See, e.g., Littel,* 1995 WL 404939, at *11 (finding unprotected the idea or thematic concept of a suspenseful story involving a brutal killer who is ultimately vanquished by the strength and ingenuity of the hero to the dismay of another character who was hoping to capture the killer for his own purpose). Analysis of the works at a more specific level reveals profound differences in the works.

For starters, the genesis of the Film's tale of revenge differs significantly from the Novel's. In the Novel, Vince's father and brother were not their killers' originally intended targets. They were innocent victims, killed only because they were innocent onlookers in the wrong place at the wrong time. On the other hand, the Film's victim, Bobby, was his killer's intended target. His fate is directly linked to his own conduct, based on events that transpired prior to Film's opening action and about which the viewer learns later.

The pace and sequence of events of the Film differs profoundly from that of the Novel. The events that unfold in the Novel take almost two years. Uncle Gino's and Vince's revenge—its planning and execution—is accomplished over the course of the Novel. Uncle Gino meticulously plans the killings, waiting for the right place and the right time. By contrast, the substantial events of the Film occur in a single day. Gino sets out for the killer, tracks him down, and kills him within the same day, in an action-packed sequence of violent confrontations between Gino and the killer and his numerous henchmen. The works do not share a similar sequence of events other than the murder by a villain followed by the pursuit and eventual killing of the villain by the avenger.

Moreover, Vince's and Uncle Gino's acts are carried out in secrecy; neither the mob nor the police are aware that Vince and Uncle Gino have identified and murdered the killers (although, at the very end of the Novel, mob boss Vittorio suspects Uncle Gino killed Frankie and Eddie). In the Film, the identity of the killer is immediately known to the police and the mob; and Gino's pursuit of the killer is known to the killer, the mob and, obviously, the police (as Gino pursues the killer in the line of duty).

The Novel's protagonists, Vince and Uncle Gino, and the Film's protagonist, Gino, are also profoundly different. To the extent plaintiff contends there is substantial similarity between any of the Film's characters and the Novel's Vince and Uncle Gino, plaintiff's contention is without basis. There is no significant similarity between the Film's contemporary-day, middle-aged police detective Gino, and the Novel's older, traditional, family-oriented Uncle Gino, despite their common Italian–American heritage and great physical strength. The Novel's Uncle Gino is a laborer, raised in the old country, where he

learned revenge at an early age. But for his meticulously planned and brutally executed revenge killings, he is essentially portrayed, and regarded in his community, as a benign, benevolent man. Because he speaks in broken English, the mobsters refer to him derogatorily, but in good nature, as "Greezer." He is somewhat simple-minded and does not drive a car well. The Novel's Uncle Gino is a subordinate character in the Novel and clearly is no action hero. On the other hand, the Film's Gino portrays an action hero. He's contemporary and stylish, sporting a ponytail. As an undercover police narcotics detective, he is street-smart and skilled in criminal investigation and drives expertly and aggressively. He employs those skills to investigate the cause of his partner's death and catch the perpetrator, all in the same day. Clearly, he is not simple-minded. Nor is he known for his gentleness. Rather, his propensity for unrepentant brutality is apparent to both police and the villain and his henchmen, as he dispatches numerous thugs in a single day utilizing his skills in martial arts. While both Ginos are physically strong and share an Italian–American heritage and the same common Italian first name, such similarities are far outweighed by the characters' dissimilarities. The characteristics they share are too general or too common to deserve copyright protection.

Nor is any character of the Film remotely similar to the Novel's late 1940's teenager, Vince. In the Film, Richie's younger brother is named "Vinnie"; and Vince from the Novel is occasionally referred to as "Vinnie." However, Vinnie of the Film is a detestable, spineless thug, who manages the bar used as a hangout by various criminal types, and whose nose Gino bloodies when he defies Gino's efforts to learn Richie's whereabouts. By contrast, Vince is the Novel's central protagonist and is not related to any of the mob members. He is a star athlete and an appealing, sensitive character, who, despite his pledge to avenge his father's and brother's murders, is deeply troubled by his participation in Uncle Gino's meticulously planned vengeance. These two characters and their roles in the respective works are profoundly different.

A review of the remaining characters in the two works reveals no significant similarity of protectible expression, notwithstanding a number of identical or similar character names. Any similarity of characterization found in the Novel and the Film relates solely to generic character concepts upon which similar characters have been commonly based. Characters molded from the same or very similar character concepts in the two works have appeared and reappeared in creative works, because those concepts are not protected. *See Nichols*, 45 F.2d at 121–22 ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly"); *Smith*, 578 F.Supp. at 1303. As defendants argue, fictional works involving Italian–American organized crime commonly employ stereotyped characters such as "Godfather" figures and renegade mobsters. Similarly, fictional works involving police and gangsters in New York City commonly employ gangsters of Italian descent and police of Irish descent. Such elements are not protectible "except to the extent they are given unique ... expression in an original creation." *See Walker*, 784 F.2d at 50 (familiar figure of the Irish cop in police fiction not protectible). Plaintiff cannot prevent others from merely identifying such gangsters by common Italian first names, such as "Frank," "Frankie," "Joey," "Paulie," and "Vinnie," or such cops by the common Irish last name "Kelly" or a variation, such as "O'Kelly" (as used in the Film). Nor can plaintiff prevent the use of the common Italian first name "Gino" for an Italian–American cop or the mere use of the less common Italian first name "Vittorio" for a "Godfather" figure.

Many of the other so-called "substantial similarities" claimed by plaintiff are nonexistent or insignificant on close examination. For instance, plaintiff claims substantial similarity in the use of the bar in the Film and a candy store in the Novel. Contrary to plaintiff's contention, these settings function differently in the works. The Novel's candy store is owned and operated by persons unrelated to any major character; there is no specific reference to its use by Frankie or Eddie or their associates, except that the

mob's gambling operations are centered there; and Vince is there only as a patron. In the Film, the bar is owned by the villain, Richie, and managed by his younger brother, Vinnie; it serves as a hangout for Richie's associates; and Gino confronts Richie's associates and other criminal types there while seeking Richie. These settings clearly functioned differently in the respective works. As for the phallic references occurring in those settings, whereas the phallic reference in the Novel is directed at Vince and is ethnically derogatory, the phallic reference in the Film is made by the central protagonist to a hood at the bar and is not ethnically motivated.

Another purported "substantial similarity" is the use of a "chop shop" and its owner in the Film and a car dealer and his dealership in the Novel. In the Novel, one of the villains (i.e., Frankie) purchases a car from a car dealer (i.e. Carl) indebted to the mob and warns the dealer against telling anyone about the purchase. After that villain's death, the car dealer tells the mob boss about the car and obtains a loan from him. In the Film, on the other hand, the villain and his associates hide out from their pursuers in the "chop shop," kill the wheel-chair bound owner, and take a car and police scanner. A close examination reveals no significant similarity of expression regarding these events, settings and characters.

Plaintiff also creatively claims "substantial similarity" as to the use in both works of a dog, a tractor-trailer, and a trapdoor. In the Film, Gino rescues an abandoned dog, names it "Corragio," and keeps it. The abandonment has nothing to do with Gino or any of his relatives, and the dog does not die. By contrast, in the Novel, Uncle Gino's father owned the dog, the dog was named "CoCo" for its "craziness," and the dog was bludgeoned, decapitated and buried by dirt poachers. The reference to CoCo shows Uncle Gino's capacity for violence and revenge, which was purposefully carried out against the dirt poachers. By contrast, the puppy in the Film shows Gino's capacity for kindness, and the confrontation between Gino and the man who abandoned the puppy is fortuitous. Thus, a close examination reveals no signifi-

cant similarity of expression regarding this theme or these events.

As for the tractor-trailer, in the Novel, Steve Cohen, an associate of the killers, and his wife are killed when their automobile collides with a "jack-knifing" tractor-trailer on a rain-slicked road as they return from a trip to upstate New York. Uncle Gino has nothing to do with that incident. By contrast, in the Film, a tractor-trailer backing into a loading dock blocks Gino's car, interfering with his pursuit of Richie during a car chase. There is no jack-knifing, no one is killed by the tractor-trailer, and no one even collides with it. Thus, a close examination reveals no significant similarity of expression regarding these events; and the mere idea of a tractor-trailer in a scene is not protectible.

As for the trapdoor, the Film's trapdoor is part of a locked vault embedded in the floor of an industrial space and is filled with money. Richie shows it to his associates, offering it to them if they stick with him. On the other hand, in the Novel, the trapdoor lies in the basement of the Staten Island house and contains weapons, ammunition, and stolen dental supplies. Uncle Gino is asked to remove the items and repair the compartment because it emits a foul odor. There is no significant similarity of expression as to these events; and the mere idea of a trapdoor to secrete contraband is not protectible.

Another purported "substantial similarity" concerns the circumstances under which Vince learns of his father's and brother's murders and Gino learns of his partner's murder. In the Film, Gino and his son are at home preparing to play "catch" when he learns about his partner's murder. The catch never takes place and his son walks away dejected, as Gino's work apparently has interfered with his family life again. In the Novel, on the other hand, Vince is outdoors vigorously playing baseball—while at camp during the summer preceding his last year of high school—when he learns of the deaths of his father and brother. Contrary to plaintiff's contention, there is no significant similarity of expression regarding these aspects of the works.

Plaintiff claims there is a "substantial similarity" in that each work involves a "race"

among the mob, the police, and Gino to capture the killer. To the contrary, Gino in the Film is not racing the police—he is the police; and he remains in contact with other police officers throughout his pursuit, in particular, Ronny, his supervisor. Uncle Gino undertakes his revenge in secret, as the police are not even aware of the killers' identities; and the mob does not pursue either killer until it learns of the foiled heroin deal and the identities of Ralph Gaetano's killers (at which point, Frankie, one of the killers, is already dead).

Plaintiff incorrectly claims "substantial similarity" in the works' respective references to a "closed casket." In the Novel, the innocent murder victims lie in closed caskets because each was shot in the head. No closed casket appears in the Film; instead, Richie boasts his toughness to his brother with his unoriginal threat against Gino.

■ Plaintiff erroneously argues that the Novel's use of New York City as a setting is a protectible element of his work. In this respect, plaintiff claims as a purported "substantial similarity" that the Film takes place "in the City of New York, on streets in working class neighborhoods," and that "much" of the action in the Novel takes place in that same setting. Contrary to plaintiff's contention, setting a police-gangster story or street justice story in New York City is not a protectible element of plaintiff's work. *See, e.g., Littel,* 1995 WL 404939, at *11 (not protectible that works set in same borough and included scenes in Central Park, One Police Plaza, a subway and a manhole). In any event, the works at issue use different boroughs and scenery, and the stories are separated by approximately 50 years.

■ Another claimed similarity is the use by both works of the Coney Island boardwalk as a setting. Plaintiff cannot claim as a protectible element of his work use of the Coney Island boardwalk as a setting. In any event, there is no similarity in the use of that setting by the Novel (*i.e.*, a villain's body is dumped there) and by the Film (*i.e.*, Gino confronts there the man who discarded the puppy).

Many of plaintiff's purported "substantial similarities" are unprotectible *scenes a faire.* An example is the fight scene in the Film where Gino uses a meat clever as a weapon. A fight breaks out in a butcher shop, the participants lunge for weapons, and one weapon—logically and predictably—is a meat clever. In the Novel, no fight is located in a butcher shop. Even if one were, plaintiff could not prevent others from staging a fight in a butcher shop or using a meat cleaver as weaponry. Moreover, the expression of this concept is substantially dissimilar in the works. In the Novel, the meat clever is carried to the scene of the killing and used to kill the villain against whom vengeance is sought. In the Film, the meat clever is found in the setting where it is used; it is used to maim, not kill; and it is used against the villain's henchman, not the one against whom vengeance is sought.

Like the meat clever, the corkscrew, used in the Film by Gino to kill Richie, is a predictable implement in the area of confrontation (*i.e.*, the kitchen). On the other hand, the spike used by Uncle Gino in the Novel is not used to kill Frankie, but to mutilate him; and Uncle Gino brings the spike to the scene in his tool box, along with the hammer, which he uses to drive the spike into Frankie's forehead.

Another of the *scenes a faire* from plaintiff's list of purported "substantial similarities" is the use of an eyewitness at the crime scene who is able to identify the killers and who sees evidence left behind. Plaintiff cannot have a monopoly on a common way in which a perpetrator of a crime can be identified—by an eyewitness—or in the idea of an eyewitness who sees evidence left behind. In any event, the expression of these ideas is substantially different. In the Novel, the two eyewitnesses (*i.e.*, Vince's father and brother) were themselves murdered by the perpetrators, and the third witness did not see the actual killings, but saw the perpetrators pursue one of the victims to the roof and then flee the scene and hide evidence. In the Film, by contrast, eyewitnesses saw the killing in broad daylight on a public sidewalk, and the evidence left behind—the photo-

graph—was purposefully left in plain sight on the victim's body.

Given that both the Film and the Novel are set in an Italian–American neighborhood and involve the mob, drugs, murder, and revenge—which are all unprotected ideas and thematic concepts—predictably, a number of details are common to both works. For example, as in the parties' works, a mob boss is likely to express disdain for a renegade member who violates the mob's rules and seek to make an example of the renegade; a murdered innocent is likely to leave behind a widow and children, stimulating a sense of injustice and justifying revenge as an acceptable response; a person seeking revenge is likely to state or imply that the justice system is either inadequate or will not fulfill the avenger's sense of justice; and a victim of a police shakedown is likely to express disdain for the corrupt cops. Copyright, however, does not afford exclusive protection to the various themes, characters, and settings shared to some extent by the works and upon which plaintiff relies, including sympathetic mob bosses, respected avengers, corrupt cops, police shakedowns, renegade mobsters, mob hangouts in neighborhood businesses, tip-offs, pointed-object-to-the-head homicides, races to capture killers, shots fired at dead bodies, generic tattoos, drug trafficking, common Italian or Irish names, mob jargon,[4] working class neighborhoods, and claps of thunder. To the extent these elements are shared by the works, none of these elements originated with plaintiff. Indeed, as defendants show, many of these themes, characters, and settings have appeared repeatedly in fictional police-gangster stories, fictional street justice stories, and other types of fictional works. *See* Declaration of Kevin McMahon. Similarities in the works as to these themes, characters, and settings are too general or trivial or are stereotyped expression amounting to unprotectible *scenes a faire*.

■ Contrary to any suggestion by plaintiff, the numerous differences between the works cannot be ignored in this Court's analysis. Rather, as the average lay observer would not be disposed to overlook them, the " 'numerous differences tend to undercut substantial similarity.' " *Warner II*, 720 F.2d at 241 (quoting *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir.1980)). Nor can plaintiff avoid the profound differences between the works by claiming the Film is an "adaptation" of the Novel. Even assuming the Film is adapted from the Novel, " 'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's.' " *Warner I*, 654 F.2d at 211 (quoting 3 M. Nimmer on Copyright § 13.03[B], at 13–37 (rev. ed. 1980)); *see also Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir.) (in action where photographer prevailed on claim that sculptor infringed photographer's copyright in photograph, court observed: "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate."), *cert. denied*, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992). Copyright infringement requires a showing of substantial similarity whether or not a work is "adapted" from another. Even if a subsequent work reminds people of an earlier work, there is still no infringement in the absence of substantial similarity. *See, e.g., Ideal Toy Corp. v. Kenner Products Division of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977) (denying defendants' motion for preliminary injunction on claim that plaintiff's toys infringed defendants' movie "Star Wars," despite fact plaintiff admittedly sought to make use of the themes embodied in its toys and the movie and despite "little doubt that [plaintiff's toys] will call to mind the movie"); *see also Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 912 (2d Cir.1980) ("[A] general impression of similarity is not sufficient to make out a case of infringement. The only similarity of significance in assessing claims of infringement is similarity of *expression*." (Emphasis in original)). Thus, even if the

---

4. For example, in the Novel, a mob member is referred to as "a button" (*i.e.,* "a member of a mob, a killer"), whereas, in the Film, a mob member gets his "button."

Film were inspired by or adapted from the Novel, that would still not be sufficient for copyright infringement given the absence of substantial similarity of copyrightable material in the works.

Contrary to plaintiff's contentions, a realistic comparison of the Novel and the Film reveals that the claimed similarities "either disappear or are reduced to ideas, *scenes a faire,* and stock figures," *Littel,* 1995 WL 404939, at * 13, or "trivial, scattered details," *Williams,* 84 F.3d at 591. Because the Film is not, as a matter of law, substantially similar to plaintiff's Novel defendants are entitled to summary judgment dismissing the amended complaint.

## III. *CONCLUSION*

For the reasons above, defendants' motion for summary judgment is granted, and the amended complaint is dismissed. The Clerk of the Court is directed to enter judgment for defendants dismissing the amended complaint and to close the file in this matter.

SO ORDERED.